We're very happy to be at the U.S. District Court for the District of Utah. Thank you for you. If there are any Utah lawyers here today, thank you for sponsoring us. We appreciate it. I very much enjoyed exploring this courthouse and we're happy to sit here as well. We're panel at the Supreme Court this week? So after you're done arguing and you want to go watch somebody else suffer through the process, feel free to do that. I'm happy to be here with Judge Ebel from Denver, Judge Phelps from Wyoming, and I don't think we have any preliminary matters. Kevin, are we okay on the recording? Let's go ahead and get started. Our first case will be 18-4025 Watts v. Watts. You may proceed. May it please the court, my name is Jim Honeycutt. With me at counsel table is my associate attorney Jamila Abu-Bakr. We are the counsel of record for the petitioner and the appellant Shane Watts. Your honors, my client's appeal focuses on the legal standard for the term habitual residence under the Hay Convention on the civil aspects of international child abduction. I'd like to start by perhaps drawing your attention to a footnote in the district court's decision. That is footnote 46, and that's found on page 23 of the trial court's order. As I was going back through the file, I submit that that footnote really is a good, solid microcosm for what's mistaken about the district court's decision. That footnote 46 really includes multiple inaccuracies on a legal basis that we can go through. One of our arguments was premised on the plain language of article 31A of footnote 46 that the district court knocked down that argument and rejected it. It's kind of buried in there a little bit. It's fascinating to me that I had cited one particular case, but in that footnote the court said I don't like that case, I don't like Walton v. Walton. It was a district court authority from Mississippi, and instead the district court said I prefer In re Ponath. In re Ponath is a district of Utah case from 1993. It was not actually mentioned in either party's briefing. It was mentioned just by the district court in its decision. And I would submit that if you compare the case that I cited, Walton v. Walton, and if you compare that with In re Ponath, the differences are startling, and it really highlights that Ponath is not on the same page as Walton is. In Ponath, it really doesn't, first off, none of these cases talk about 31A. I acknowledge that. Okay, what's the standard you're advocating for? The standard I'm advocating for is if you read 31A of the convention, it says you look at a territorial unit of each country. In our case, the family went from North Carolina to Australia to Utah, and the district court made that the entire United States of America... Okay, what's the standard before we get to what the district court... What's the standard for how we define habitual residence? Yeah, but what do you want our opinion to look like? I want you to embrace my argument about 31A that says you look at it on a state-by-state basis. That's part of the standard. The statute only says you have to look at a political subdivision if the law is different, and both Australia and the United States have adopted the Hague Convention as a national adoption of national law, so the law of the Hague Convention is not going to be different between states, North Carolina or Utah or Australia, and because that predicate isn't met, it seems to me that we just look at the U.S. as an entity and Australia's unity, so you've got to address for me that proviso about if the law is different. Sure. Well, 31A talks about matters of custody of children. We look for different territorial units that have different systems of custody laws. It's explicit that the Hague Convention is not a custody law. We don't get into best interests or what the custody of the children should be. It's about the immediate return of the child to his or her place of habitual residence, and I submit that when you look at Article 31, it's talking about in relation to a state, and in this context that means a country, and when we look at a treaty, the word state means country, in relation to a country that when it comes to child custody laws has two or more systems of law, and I submit that this country has 50 plus systems of law. Every state approaches child custody matters differently, and the territories in Washington, D.C. There's different systems. So does Australia. Fair enough. Presumably. So we were talking about Victoria versus Utah versus North Carolina. That's the premise of my argument, but I still don't know what the standard you want us to adopt is. What does habitual resident mean? That it's going to apply not just to Shane, but to every parent going forward in this circuit. Well, I think it's a combination of shared parental intent. That's one of the two prongs of the test that's been adopted throughout the country, and then the other one is acclimatization of the minor child, where the child's used to living and also where the parents have lasted. The case that explains that the best, if there is one, what case should we adopt in your view? Well, I think this court has already adopted Fetter versus Evans-Fetter. That's a great place to start. That quotes the seminal language from the English case Ray Bates. That's a central focal point of our appeal briefing that explicitly says a child doesn't have to be permanent or forever in a place to change the location of habitual residence. In that British case, Ray Bates, the three-year-old child, had only been there a month or so in the state of New York, and the British court said, yeah, under these circumstances, that's long enough. We've cited multiple cases where you don't have to be there forever, and obviously our other argument was the district court erroneously conflated domicile with habitual residence. The court was looking for permanency. The word I kept hearing over and over during the trial was forever. Is this forever? Was moving to Australia forever? In our review here, we're looking at clear error on the fact finding and then abusive discretion in the way you applied those findings, correct? Well, we've never argued clear error. We're not saying any of the historical or narrative facts were erroneous. We're saying the application of those, of the law, and that's a de novo review, not a discretion review. And Sheely versus Sheely says that. That's a Tenth Circuit case that says we do a de novo review of the application of the facts to the law. Did you put evidence in the record that the custody law in North Carolina is different than the custody law in Utah? Probably not, no. I don't can we address the argument you are making that we needed to look at the specific state for comparative? Sure. Well, I think it's law. I'm not aware that I need to put on evidence of law. I mean, when I do argue with the court that this 31 applies, but how is the court going to know whether the law is different? I mean, it's not that you can just look at the statute. You have to look at the interpretation, the case law and everything else. It's a complicated question. Well, you know, I guess as a divorce lawyer, I just took it for granted and I apologize. But from my point of view, I believe this court... Are they different now? Can you represent to this court that they are materially, substantively different, that they would lead to different outcomes? Of course. All 50 states... No. Do you think, have you compared those two where you can represent to the court that the outcome of custody on these facts would be in North Carolina than in Utah? Probably. Yeah. Just because... You have done that comparison. I'm not asking you just to speculate. No. No. Okay. All right. Well, what sort of difference would matter? Well, I'm not the one who wrote this language of the statute, but this is how they decided to chop up how we look at a country that is chopped up. But you're making the argument for some reason, and that's what I'm at least struggling to find out why. What would be the difference between North Carolina and Utah that you think would matter? Well, 1,700 miles. I think that matters. I mean, most of the cases, it's an ABA where they start in American State A, they go to foreign country B, they come back to American State A. That makes sense. That's where the child was. It was wrong for that parent to take the child out of the country. And now they're going back to State A. But they were transitioning from North Carolina through Utah, apparently, where there was some family connection, and then off to Australia. Fair enough. What do you think the most important fact is that would support Shane's determination of habitual residence in Victoria? Well, I think there's a lot of facts that the court opted to overlook. The application for permanent visa by the mom in Australia. What's the one or two facts that we should accept that would basically control the outcome in your favor? Well, there was a meeting in April 2017, where according to the mom's testimony, they all agreed the children should remain in Australia. That was an agreement. But we're asking whether the children thought that the children had habitual residence someplace. And the parents' agreement is only a first test. It's not the ultimate test, I think. The ultimate test, it seems to me, addresses what the children's habitual residence was from their point of view. Now, if they're young, obviously, the parents' agreement or not will be decisive. As they get older, that starts to slow down on the slope, and the children get more of their own independence. So we've got different ages of children here, so it's kind of a complex question. But it's not just resolved about what the parents sat down and agreed to. That's true. You look at both factors. You look at shared parental intent, and you look at the child's acclimatization. They'd gone to school there for eight or nine months. They made friends. They were involved in extracurricular and cultural activities. And they had no expectation they were going to be going back to Utah. That was never even suggested to be their habitual residence. No one ever suggested in this case that Utah was the habitual residence. If they were students in a boarding school in Australia for three or four years, and the expectation is they'd come back to the United States, where would the habitual residence be in that circumstance? Well, if it was like a summer camp or a boarding school, that's very different, Your Honor. I think that's a different set of circumstances. So sure, are you saying the parents are back in America, and the children are by themselves off in Australia? Let's say they come and visit for extended periods of time. I agree. That doesn't change habitual residence. They'd still be residing in the United States, right? Probably. And what if they were military kids, and they had military assignments in Europe a year at a time in various places? Well, there's many Hague cases that touch on that, and that can change habitual residence if someone's there long enough, even if it is because of a military assignment. No court has ever said how much is long enough. Correct. There is no bright line standard for whether... And in fact, doesn't the Hague Convention specifically tell us that they don't want rigid formulas? Correct, and I would submit... And so if that's the case, we don't have rigid formulas. It's not kind of a legal three-step process. Why isn't the best judge able to make this decision is the district judge that has interviewed, reviewed, questioned the kids, which is what we have here? If we're simply going to get kind of a holistic view, we're not the ones to give a holistic view of those kids' habituation. Well, I submit it was the application of the law. The district court embraced this Moses and its progeny from California, which I submit is a case that's been misused. We've cited some Eighth Circuit precedent that I think did a really good job, Robert versus Tesson, criticizing how Moses encourages abuse of the convention, because it encourages parents to plant the seeds of doubt and then later do the grab and run. In Olander versus Larson, this court was very critical of both parties doing the grab and run. And if you look at it from a policy standpoint, what Robert and Tesson versus Tesson encourages this court to look at is the idea that you are inviting, you're empowering a future abductor to lay the foundation. Here's a hypothetical. Let's say I have a client who comes to me and says, Jim, I want to move to Australia, but you know, my marriage is rocky. I got my girlfriend in France. What can I do to leave my options open? Am I really supposed to tell him the truth? Because under what the district court did in this case, and frankly, what the Moses court did in that case, am I really supposed to say, well, client, why don't you do this? Send an email to your wife that says something like, hey, honey, I'm so excited to go to Australia. It's going to be such a fun experiment. It'll be so cool living in Australia temporarily, and then we'll move back to America in a few years. And then maybe we should try New York or Puerto Rico or Idaho. Client, if you do that, that's exhibit A, and you have all the flexibility in the world. And if you want to go to France, you can go to France. That was their argument at trial. And the court embraced that argument that, well, 11 months wasn't permanent enough. Your agreement to live there two to two and a half years was shifted to three to three and a half years. That's not permanent enough. Because you didn't have a permanent agreement to stay in Australia indefinitely. And you knew that one day you were going to come back to America. You could move to France. Out of curiosity, is Shane still in Australia? Primarily, yes. He's also renting a temporary home here while this plays out. Why couldn't Shane just go to North Carolina and Utah and battle it out on custody? Well, the parties stipulated that Australia has jurisdiction over these children. They're litigating in Australia right now in their divorce. That's ongoing. And you don't have very much time, but I'm going to sure ask the appellee. I don't see how they can stipulate because the jurisdictional predicate to custody is that's where the kids reside. And so I do see a huge disconnect there, but I won't take your time for that. But I'm troubled. I agree. I think that's another one of those. You're asking for facts. That's another good fact for my client. I think it's hard to get around. All right, counsel, your time's up. I appreciate that. Let's hear next from Mr. Lieberman. Thank you. Good morning. Ben Lieberman on behalf of Kerry Watts. May it please the court. I'll pick up right on that question because I know it's certainly. You'd be amazed how many lawyers don't. It seems to me if there was ever a slam dunk, that's the slam dunk. So yes, pick up on the question. The answer to that question is we stipulated to Australia being able to address the terms of the party's divorce and the custody of the children to some degree. Not to some degree. Australia is going to settle the custody of the kids, right? That is not just to some degree. They're going to decide. And the predicate for the Australian court having jurisdiction is that that is where the residency of the kids is, right? Not is, but was. Well, until the woman took them away, but was as of the moment of the breach or was it as of the moment of the... Is there a divorce proceeding now? So there is a divorce proceeding now. There are jurisdictional issues that are being raised. What temporal test is the Australian court going to look at to decide whether it has jurisdiction? That's a great question. That's a question that I have been asking the lawyers in Australia and have never quite gotten a straight answer to. Our understanding is that Mr. Watts is not currently in Australia, that he is in Utah now. And so I frankly have a question and I had a question for some time that I have been asking the Australian lawyers with no real clear answer as far as why there is still jurisdiction in Australia, why they haven't vacated jurisdiction and why we're not addressing... Why didn't Carrie file here? Over here. Why didn't she file for divorce here in Utah? There were... Under Utah state law, the children would have to be here for six months before she was able to file here. But to me, the issue... Where are the children? The children are here in Utah. They've been here for six months. Right, they have. But there's also a proceeding in Australia. And so we can't have... There can't be two dueling proceedings. But why did the proceeding in Australia, why did Carrie even agree to that? And isn't that just square out inconsistent with the positions he's taking here? No, it's not. And the reason is, is because one of the purposes of the primary purpose of the Hague Convention is that you don't have this forum shopping. You don't have somebody taking the children out of Australia to Utah, filing for a seeking custody rights in Utah as a forum shopping mechanism. Here, we weren't forum shopping. And when we say we, I mean, I'm not involved in the Australian... But wasn't a predicate of Australia assuming divorce and custody issues? Wasn't a predicate of that that the children were not only habitually resident there, but that they were residents of Australia? No. What is the jurisdictional predicate of the Australian court assuming custody questions over these children? So that's a question that I can't answer. But as far as if it were in Utah, in Utah, it would have nothing to do with habitual residents. It's mere presence for six months. With respect to divorce alone, without custody issues, it's three months. And so it has nothing to do with habitual residents or domicile or anything. It is residency in the state for six months. And so Kerry could have moved to... But we don't know that that's Australian law. Correct. This is very frustrating to me. That's, to me, one of the central problems you've got. And you don't have the information for us on that. That is not part of the habitual resident standard. It's part of a judicial estoppel standard, which I guess hasn't been argued here. But it seems to me to be a potential absolutely inconsistent allegations that your client is making. And I don't agree with that, Judge. I think that you can concede jurisdiction in a forum without conceding that you ever agreed to habitually reside there. The standards under the Hague Convention are different than the standards under the custody laws. You're not telling us what those standards are. So we just have to take your word for that. Well, the Hague Convention is not about custody. The Hague Convention specifically disclaims that. I know that. But both custody and Hague have a very similar... They're doing very different things for different purposes. But they both have the same kind of test, don't they, as to whether the court has custody over the child and habitual residence is apparently, according to what you've said, kind of the same anchor for both. I don't believe I've said that. And I don't believe that's accurate. Habitual residence is a Hague term. And I'm not aware of anywhere that applies that kind of habitual residence standard to it. But residency is. Right. But habitual residency is different. I mean, residency is a much different term than habitual residency. Habitual residency implies real strong roots. If we were analogizing to Utah, there may be an habitual part of it because Utah, you said you have to be there six months to get child custody issues. So if Australia has the same thing, it's going to require some kind of an habituation or some kind of at least length of time. But length of time is one of and probably not the most important factor of what habitual residence is. I mean, mere residency. I can change my residency to New York and I can go live in New York for six months with absolutely no roots and absolutely no interaction with anybody whatsoever. And I may be a resident for six months, a year, two years, but I'm not a habitual resident because I haven't, I don't have roots and my children don't necessarily have the roots that would be disrupted by removing them from that. Habitual residence is shared intent plus acclimatization. And neither one of those has to do specifically and exclusively with the passage of time. Whereas jurisdiction often does. Jurisdiction often is only about time physically present somewhere. And habitual residence is very different. They were there a year and they expected to be there a couple more years during the medical treatment of one of the children. I mean, that's more than summer camp. It's more than a vacation. It's more than a temporary project. I mean, they were, they bought a house. The in-laws lived nearby for Kerry. The kids were in school. Kids were doing well in school. You know, that seems like both intent and acclimatization would cut against the decision of the court here. But the important thing on that and what I think council continues to omit in all of the argument is there's this argument of, well, the district court required permanence. The district court required indefiniteness. The district court did not require either of those things. The issue is that there are these cases and there's dozens of them that talk about these intent to return and some of these cases are six months and some of these cases are three years. What's your best case? The one case you hang your hat on. I mean, to me, although it's not an appellate case, the case of Mertens from the district court in New Mexico from this circuit is on all of them. What was the name of it again? Mertens. Mertens. It's from the district of New Mexico. It is shockingly similar to this case. It's a case where, in this case, Mr. Watts operated a dirt bike company that could be operated anywhere in the world. In that case, it was a motorcycle touring company that could be operated anywhere in the world. And specifically in that case, there was an application for a permanent visa, just like in this case. And the judge in New Mexico rejected that as a basis for determining there was this intent to reside there permanently, even though it was a permanent visa. Did the judge in New Mexico apply the same standard as Judge Shelby here? Yes. And ultimately, the standard really isn't that different across all the circuits. Yeah, I agree with that. And really, at the end of the day, since Mr. Watts isn't challenging any factual finding here, we're really left with, you've got this shared. Is it de novo review, the application of those facts to the standard? I think it's abuse of discretion. But I apologize. I don't have the case in front of me. But even if it was clear error, or excuse me, even if it was de novo, the underlying factual findings are so strong that there really isn't an opportunity for any kind of reversal on a de novo basis. I mean, you look at the factual findings that are on page nine of the trial court's order. De novo doesn't rely on a factual finding. De novo means we do our own independent review. Well, we're taking the factual findings. We take the evidence and then make our own findings. But with respect to, I mean, I think that that would. That would. That's what de novo means. I just think on these facts, it would be almost impossible for a foreign parent to win. I mean, it just seems to me that Judge Shelby's really stacked the decks here for, you know, for Kerry's position. I mean, I just, I'm trying to imagine how anybody could be habitually residing in Victoria, Australia under the facts that Judge Shelby found. And I think the answer to that question is that it had, had there not been a, an agreed upon specific intent to return. Okay. That's what you'd hang. That's what distinguished this case from the other ones where expats move away and then marriages break up. Correct. Correct. I think when you look at the cases where people move, they move all of their possessions. They leave nothing of behind or nothing of any importance behind. And they, and they leave either indefinitely or permanently or, or, or they leave with no specific plan as far as when they're going to return. Then it's a different case. But here they had a specific and agreed upon attention, intention to return. The purpose. After what? Was it three years? Was it three years? Initially the specific purpose was for the orthodontia and to avail themselves of the socialized medicine system in Australia. And so there was not a specific time period as far as amount of months or years, but it was until that was completed was the intention, but there was always the specific intention to return to, to the United States. And that distinguishes that from any other case. What you're saying is that on a military, that would say that on military situations, almost never would you have the, the, the, the new visiting country be the location, because usually they live in military housing. They don't take all their furniture with them and they expect after a military assignment that they will move. And so basically that would end up with almost a per se rule that you're never going to get the host country for this question, for the Hague convention, if there's a military context. Well, I think it's a challenge in that context when, when, when there are limited and narrow military deployments. I mean, there, there are cases where, where that does exist, but, but I think that you to a specific agreement as far as the, the, the, the purpose for the visit or excuse me, the purpose for the for the relocation and the specific intent to return then, then I think you don't change the habitual residence at all. And when, and when you don't have roots that are put down, that would be, that would be you know, change that habitual residence. That's, it becomes a real challenge. If you're living in military housing, if you're not integrating yourself into the society of, of the new country and you're just living on a military base, then I think you, you have a, you have a hard time both on the acclimatization and the shared parental intent. Can I come back to where we started with you? How old are the children today? Um, I, I, I believe we're just a year past the trial, so they would be 13, approximately 10 or 11 and seven or eight. And, um, just if you can clarify me, I'm probably still confused about, um, the divorce proceedings. Will the, will an Australian court, um, determine custody of these two children? Um, my understanding is, is that that is up for argument that because neither party, um, remains in Australia, and it sounds like that may be a disputed fact, um, but because neither party, uh, remains in Australia, uh, that, uh, that, that there's the possibility of a jurisdictional change here to Utah. If, if the Australian, assume that the court did assign custody in this proceeding over objections and whatever, and that's upheld, um, would American courts be in any, in any position to set aside the Australian determination of custody? Um, I, I think only if, only if they were both residing here, the matter was registered here. Uh, and then you had a new proceeding, a new proceeding to modify that. Okay. And I, you know, I don't know what the hometown advantages in this case. Um, and we're happy to decide the case, but maybe the two sides ought to decide where the kids ought to, where the custody ought to be and, and settle out. And certainly we've made a lot of, we've made a lot of attempts to do that. And this is a challenging case to, uh, um, to, to settle and, uh, all right. Well, many domestic cases are your time's up. We appreciate the arguments. Those were really well presented. Thank you. Difficult case. Um, the lawyers are, you're excused and the case shall be submitted.